# IN THE UNITED STATES DISTRICT COURT FOR THE
# WESTERN DISTRICT OF MISSOURI
# CENTRAL DIVISION

| | |
|---|---|
| THE ESTATE OF DAVID EUGENE MORGAN, JR., | ) ) ) |
| Plaintiff, | ) ) |
| v. | ) Case No. 2:10-cv-04145-NKL ) ) |
| JOHN EDWIN COOK, et al., | ) ) |
| Defendants. | ) ) |

## ORDER

Pending before the Court is a Motion for Complete Summary Judgment [Doc. # 41] brought by Defendants Officer John Edwin Cook ("Cook") in his individual and official capacities, Chief of Police John Degonia ("Degonia"), and the City of Sedalia, Missouri ("the City") (collectively "Defendants"). Plaintiff, the Estate of David Eugene Morgan, alleges the use of excessive force by Cook, supervisory liability by Degonia and the City, and state law charges of excessive force and outrageous conduct against all Defendants stemming from a fatal police shooting of David Morgan on June 30, 2007. For the following reasons, Defendants' motion is DENIED as to Plaintiff's Section 1983 claim against Cook, and GRANTED as to all other claims.

## I.     Factual and Procedural Background[1]

---

[1] The Court has considered the parties' statements of undisputed fact which are supported by evidence. In considering the pending motion, the Court has drawn all inferences in favor of the non-movant.

David Morgan ("Morgan"), Angeline Jackson ("Angeline"), and Angeline's son, Andrew Jackson ("Andrew") resided at 720 North Lamine Street, in Sedalia, Missouri. Rhonda Jackson ("Rhonda") frequently visited Angline at her residence. At some time during the day of June 30, 2007, Rhonda arrived at Angeline's house, intoxicated. Rhonda continued to drink with Angeline through the day.

While Rhonda was visiting Angeline, Morgan was at the house and was also intoxicated. After an argument broke out, Morgan began "throwing stuff, cussing, [and] hollering . . . ." [Doc. # 42-3, at 17 (Deposition of Rhonda Jackson)]. Morgan located a household knife and tried unsuccessfully to cut the phone line inside the house in order to prevent Rhonda or Angeline from calling the police. Failing that, Morgan went outside and cut the phone line there. Because the phone was no longer working, Rhonda went to a neighbor's house to call the police. Before she left to call the police, Rhonda saw Morgan with a knife. This knife, including the handle, was about eleven inches long. [Doc. # 42-3, at 18 (Deposition of Rhonda Jackson, 14:16-25, 15:1-6)]

The police department dispatched two officers, Cook and Officer John Comfort ("Comfort"), to 720 North Lamine Street in response to Rhonda's call. Cook had been patrolling alone about four blocks from the house when he was dispatched, while Comfort was at Police Headquarters about ten blocks away. The officers were dispatched at 14:05:18 and Cook arrived at the house at 14:06:26.

Cook was familiar with Morgan due to law enforcement encounters with him over the past eleven years. For example, Cook found Morgan intoxicated on the streets of Sedalia

many times. Cook had never arrested Morgan, and it was his practice to give Morgan a ride home when he found Morgan in the street. Cook had also intervened in disturbances involving Morgan. Cook testified that he knew Morgan to abuse alcohol, and that, each time he saw Morgan over the past eleven years, Morgan was intoxicated. [Doc. # 42-2, at 9 (Deposition of John Cook)].

From their past interactions, Cook knew Morgan to carry a "small lock blade" pocket knife with a blade "[a]bout an inch and a half, two inches" long. [Doc. # 42-2, at 7 (Deposition of Cook, 74:12-18)]. Cook testified that he had heard that Morgan had cut Angeline in the past, but did not know specifics. There was no reason for Cook to believe that anyone had been injured at the house when he responded to the call on the day in question.

Cook arrived at Angeline's house before Comfort and parked in front of the house, which is contrary to Department policy. The nature of the call required two officers to be dispatched to the scene, where the first responding officer must wait for the second unless the situation was an emergency or life threatening. Cook testified that he was unaware of that policy, and decided to assist without waiting for backup. Cook carried his duty weapon, pepper spray, and a night stick, but not a TASER. Cook knew that Comfort did carry a TASER. Cook did not notify anyone that he was approaching the scene by himself. It was Cook's belief that, because of his past dealings with Morgan, he would not have any problems on this occasion.

The house at 720 North Lamine Street has a porch in front. The porch is elevated about a foot above the ground. It does not have a railing, but does have three vertical wrought iron posts from porch to ceiling.

When he arrived at the house, Cook observed Morgan standing alone on the porch walking toward a chair on the porch. There was no one else outside the house. Morgan stumbled over a white chair on the porch and fell into a blue one. This and Cook's prior dealings with Morgan led him to believe Morgan was intoxicated.

Cook approached the porch and stopped between six and twelve feet from the porch, which is about half-way between the porch and a chain link fence in front of the house. Morgan remained seated. Angeline then came out of the front door and told Cook that Morgan had a knife, which Cook then observed Morgan trying to conceal in his hand. The knife held by Morgan was a "little . . . kitchen type" knife. [Doc. # 42-3, at 4 (Deposition of Andrew Jackson, 9:5-13)]. Cook then drew his pistol and pointed it at Morgan. Morgan said to Angeline, "Go ahead and shoot me. I want to die anyways, I'm gonna die anyways." [Doc. # 42-1, at 11 (Deposition of John Cook)].

Angeline, who Cook believed to be intoxicated also, walked over and stood next to Morgan, who did not acknowledge her. It is sound practice for a lone officer to request assistance when he perceives a threat, but Cook did not notify Comfort or anyone else that Morgan had a knife. Angeline stepped about three feet away from Morgan only after Cook twice instructed her to move away from Morgan. Cook then twice ordered Morgan to drop the knife.

4

Angeline testified that Morgan appeared to not hear what Cook was telling him. She said Morgan seemed to be "in space like he didn't hear him." [Doc. # 42-2, at 20 (Deposition of Angeline Jackson, 18:2-3)]. Morgan then abruptly stood up with the knife in his right hand in full view, and leaned against and held on to one of the porch's wrought iron pillars. Morgan did not raise the knife.

Cook then perceived that Morgan began to take a step towards him. However, Morgan did not move. [PA0250 (Interview of Carl Nagy by Corporal D.S. Nace)]. Cook then shot Morgan once in the chest. Morgan fell directly in front of the porch. The knife Morgan had been holding was later found on the porch. Morgan subsequently died at the hospital after two hours of surgery. When asked later about the shooting, Andrew told a citizen that Cook "did what he had to do to protect his self [sic]." [Doc. # 42-3, at 10 (Deposition of Andrew Jackson, 32:24-25)].

Morgan's post mortem BAC was calculated by a toxicologist to be .234 mg/dl, which is approximately three times the legal limit to operate a motor vehicle. A BAC that high would result in significant impairment of muscular coordination, comprehension, decision making and judgment. [Doc. # 42-4, at 11 (Pathology Report by Dr. Christopher Long, Ph.D.)]. Morgan and Rhonda had been in physical fights in the past. Rhonda had previously called the police on Morgan at least twice. Andrew testified that he had called the police "over 100" times because Morgan was being abusive or was intoxicated. [Doc. # 42-3, at 11 (Deposition of Andrew Jackson)]. It was Morgan's habit to hide all the kitchen knives

5

around the house, and to cut the phone lines to prevent Rhonda or Angelina from calling the police.

Cook was sent to a number of different police training courses in the use of force and defensive tactics while working for the City of Sedalia. When showed certificates dating back as far as 1999, Cook was unable to recall what specific training matched a particular certificate.

The City has policies concerning the use of force by police officers. Policy 12.21.00 imposes a duty upon police officers to act in such a manner as to prevent further injury to another person. The policy dictates that officers arriving at the scene of a domestic violence call are to arrive at the scene and approach together. Cook violated this policy by failing to wait for another officer to arrive. Policy 10.03.00 imposes a duty upon the individual officers to exhaust every reasonable means of apprehending a suspect before resorting to the use of deadly force.

Degonia arranged regular training for his officers, but officers were not reprimanded when they failed to comply with the Department's policies and procedures.

The City received certain liability coverage from the Missouri Public Entity Risk Management Fund ("MOPERM") during the time in question.

On June 30, 2010, Plaintiff filed this action in the Circuit Court of Pettis County, Missouri. Plaintiff alleges violations of 42 U.S.C. § 1983, intentional torts, and negligence against Defendants Cook, Degonia, and the City. The case was removed from the state circuit court to this Court on July 8, 2010 pursuant to 28 U.S.C. § 1441(b).

## II. Summary Judgment Standard

Summary judgment is proper "if the pleadings, the discovery and disclosure materials on file, and any affidavits show that there is no genuine issue as to any material fact and that the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(c). The moving party "bears the initial responsibility of informing the district court of the basis for its motion" and must identify "those portions of [the record] which it believes demonstrate the absence of a genuine issue of material fact." *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986). If the moving party satisfies its burden, Rule 56(e) requires the non-moving party to respond by submitting evidentiary materials that designate "specific facts showing that there is a genuine issue for trial." *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986). In determining whether summary judgment is appropriate, a district court must look at the record and any inferences to be drawn from it in the light most favorable to the non-moving party. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 255 (1986). Summary judgment is not proper if the evidence is such that a reasonable jury could return a verdict for the non-moving party. *Id.* at 248.

## III. Discussion

### A. Count I: Claim against Cook under 42 U.S.C. § 1983

Government officials, including police officers, are entitled to qualified immunity for their official duties if their actions do not violate clearly established constitutional rights of which "a reasonable person would have known." *Harlow v. Fitzgerald*, 457 U.S. 800, 818 (1982); *see also Hassan v. City of Minneapolis*, 489 F.3d 914, 919 (8th Cir. Minn. 2007).

All Fourth Amendment claims brought under 42 U.S.C. § 1983 alleging that a law enforcement officer has used deadly excessive force in the course of an arrest, investigatory stop, or other seizure, are properly analyzed under the Fourth Amendment's "objective reasonableness" standard. *Graham v. Connor*, 490 U.S. 386, 394 (1989). Reasonableness is judged from the perspective of a reasonable officer on the scene, rather than with the 20/20 vision of hindsight. *Chambers v. Pennycook*, No. 09-2195, 2011 U.S. App. LEXIS 11392, at *15 (8th Cir., June 6, 2011) (quoting *Graham*, 490 U.S. at 396)). "[W]here [an] officer has probable cause to believe that [a] suspect poses a threat of serious physical harm, either to the officer or to others, it is not constitutionally unreasonable for the officer to use deadly force." *Hassan*, 489 F.3d at 919 (quoting *Brosseau v. Haugen*, 543 U.S. 194, 197-98 (2004)).

Thus, here, Plaintiff's claim of excessive force centers on whether a reasonable officer on the scene would have believed that Morgan posed an immediate threat to the officer. The facts show that a reasonable officer in Cook's position would not have used deadly force because there was no probable cause to believe that Morgan posed a significant and immediate threat of death or serious physical injury to the officer. Although Morgan attempted to conceal his knife while Cook approached the porch, Morgan was initially seated between six and twelve feet away from Cook when Cook first drew his gun at Morgan. Although Morgan abruptly rose from his chair while still holding the knife, he then leaned against a pillar on the porch for support. Morgan did not advance towards Cook, nor did he raise the knife. Moreover, the knife was a "little" "kitchen-type" knife. Simply because

8

Morgan failed to obey Cook's instructions–repeated only twice–to drop the "little" knife does not render Cook's use of deadly force objectively reasonable, nor does Cook present any case law to persuade the Court otherwise. Cook has failed to demonstrate to the Court that Morgan did not suffer a deprivation of his Fourth Amendment rights from unlawful seizure, or that he acted reasonably. As such, Cook is not entitled to qualified immunity from this claim.

The Court notes that Plaintiff also alleges multiple violations of the City's policies regarding Cook's actions in responding to the call. While these violations may constitute negligence or even recklessness on Cook's part that may have put him in the conflict with Morgan, they do not amount to a constitutional violation of Morgan's rights. *See Davis v. Scherer*, 468 U.S. 183, 194 (1984) ("Officials sued for constitutional violations do not lose their qualified immunity merely because their conduct violates some statutory or administrative provision.").

For the above reasons, the Court denies summary judgment to Defendant Cook for the § 1983 claim against him based on his use of deadly force, and grants summary judgment as to any § 1983 claims premised on violations of the City's policies.

B.     **Count II: Claim against Degonia and the City under 42 U.S.C. § 1983**

As a preliminary matter, the Complaint does not specify in what litigation capacity Plaintiff is suing Degonia. In the Eighth Circuit, where a pleading against a government employee does not specify litigation capacity, "it is presumed [the employee] is sued only in his official capacity." *Artis v. Francis Howell N. Bond Association, Inc.*, 161 F.3d 1178,

9

1182 (8th Cir. 1998). As such, Plaintiff's § 1983 claim against Degonia is actually directed at the City itself. "A suit against a government official in his or her official capacity is 'another way of pleading an action against an entity of which an officer is an agent.'" *Baker v. Chisom*, 501 F.3d 920, 925 (8th Cir. 2007) (citing *Monell v. Dep't of Soc. Servs.*, 436 U.S. 658, 690 (1978)).

Plaintiff claims that the City violated Morgan's constitutional rights because alleged deficiencies in their hiring, training, and supervisory practices resulted in a deprivation of Morgan's constitutional rights, i.e., Cook's unlawful use of excessive force. When a § 1983 claim is asserted against a municipality, the Court must analyze "(1) whether Plaintiff's harm was caused by a constitutional violation, and (2) if so, whether the city is responsible for that violation." *Collins v. City of Harker Heights*, 503 U.S. 115, 120 (1992). Municipalities are not liable unless "action pursuant to official municipal policy of some nature caused a constitutional tort." *Id.* at 121; *see also Wolfe v. City of Aurora*, No. 08-05087-CV-SW-DGK, 2011 U.S. Dist. LEXIS 41579, at *17.

Here, Plaintiff fails to allege any direct violation of any City policy by the City, or that the City maintains a policy or procedure which caused Cook to use of deadly force. Rather, Plaintiff appears to allege respondeat superior liability for the actions of Cook. However, such allegations cannot stand because the City is not "vicariously liable under § 1983 for the constitutional torts of its agents: It is only liable when it can be fairly said that the city itself is the wrongdoer." *Collins*, 503 U.S. at 122.

Plaintiff additionally claims that Degonia failed to properly train Cook, and that if Cook had received more complete training, he would have resorted to some alternative method without engaging in unconstitutional conduct. Plaintiff's claim against the City and Degonia, premised on Degonia's alleged failure to train, fails for two reasons.

First, as the Court previously noted, because Plaintiff has sued Degonia only in his official capacity, Plaintiff's claims are directed solely at the City. The City cannot be held vicariously liable for Degonia's actions. *Collins*, 503 U.S. at 122.

Second, even if the Court construes Plaintiff's complaint as a suit against Degonia in his individual capacity, Plaintiff fails to demonstrate how Degonia is not entitled to qualified immunity. "A supervisory officer is entitled to qualified immunity for a § 1983 failure to train action unless a reasonable supervisor would have known that his training program (or lack thereof) was likely to result in the specific constitutional violation at issue." *Parrish v. Ball*, 594 F.3d 993, 1002 (8th Cir. 2010). The deficiency of police training can be the basis for a § 1983 liability only where it amounts to "deliberate indifference to the rights of persons with whom the police come into contact." *City of Canton v. Harris*, 489 U.S. 378, 388 (1989). Thus, to succeed under a § 1983 failure to train action, a plaintiff "must demonstrate that the supervisor was deliberately indifferent to or tacitly authorized the offending acts. This requires showing that the supervisor had notice that the training procedures and supervision were inadequate and likely to result in a constitutional violation." *Andrews v. Fowler*, 98 F.3d 1069, 1078 (8th Cir. 1996).

Here, Plaintiff only points to the lack of evidence "that Degonia disciplined any officer involved in the abuse and killing of Morgan" [Doc. # 45, at 22] to demonstrate that Degonia was "deliberately indifferent to or tacitly authorized" Cook's actions. This is insufficient to show that Degonia had notice, prior to Morgan's death, that his department's training procedures were inadequate or likely to result in a constitutional violation. Thus, because Plaintiff has failed to demonstrate that Degonia had notice as required by *Andrews*, summary judgment is appropriate for Degonia.

For the foregoing reasons, the Court grants summary judgment to Defendants Degonia and the City for the § 1983 claims against them.

C. **Counts III, IV, V: State Claims for Use of Excessive Force, Negligence, and Outrageous Conduct against All Defendants**

i. **Claims against the City**

Municipalities generally enjoy immunity for "those actions they undertake as a part of the municipality's governmental functions – actions benefiting [sic] the general public." *Kunzie v. City of Olivette*, 184 S.W.3d 570, 573 (Mo. 2006) (quoting *Junior Coll. Dist. of St. Louis v. City of St. Louis*, 149 S.W.3d 442, 447 (Mo. 2004)). The test as to whether sovereign immunity applies is whether the "act performed is for the common good of all or whether the act can be performed adequately only by government and is governmental in character." *State ex rel. Allen v. Barker*, 581 S.W.2d 818, 824 (Mo. 1979). When performing governmental activities, cities are protected by governmental immunity unless some exception applies. *Kunzie*, 184 S.W.3d at 574.

There are two sovereign immunity exceptions in Missouri law. First, purchasing liability insurance "may function as a wavier of sovereign immunity." *Brennan v. Curators of the Univ. of Mo.*, 942 S.W.2d 432, 436 (Mo. Ct. App. 1997); *see also* Mo. Rev. Stat. § 71.185 (municipalities carrying liability insurance shall be liable for torts to the extent of the insurance so carried); Mo. Rev. Stat. § 537.610 (sovereign immunity for the state and its political subdivisions is waived only to the extent of and for the purposes covered by liability insurance policies). Second, sovereign immunity is waived for claims arising from the operation of motor vehicles and injuries caused by the condition of public property. *See* Mo. Rev. Stat. § 537.600.

The parties agree that regarding the claims at issue, the City acted in a governmental capacity. Therefore, in order for Plaintiff's claim to survive summary judgment, Plaintiff must show some exception to the City's sovereign immunity. The parties also agree that the only possible applicable exception to the City's sovereign immunity is whether the City had procured liability insurance that would cover claims arising out of Morgan's death.

Here, the only liability insurance at issue is the coverage provided by MOPERM. Thus, Plaintiff has a viable claim only if MOPERM provides coverage for it. Section One of MOPERM's "Memorandum of Coverage" clearly states that "nothing contained in this section, or the balance of this document, shall be construed to broaden the liability of the Member Agency beyond the provisions of sections 537.600 to 537.610 of the Missouri statutes . . . ." [Doc. # 42-4, at 18]. "The only claims on causes of action established by Missouri Law [which the City can be liable for], which are covered under the MOPERM

13

policy, are those claims arising out of injuries resulting from the operation of motor vehicles or dangerous conditions of property." *Topps v. City of Country Club Hills*, 272 S.W.3d 409, 416 (Mo. Ct. App. 2008). Plaintiff does not direct the Court to any contrary law why MOPERM's policy should not be construed by the Court in a manner consistent with Missouri state court opinion. Plaintiff also fails to identify any language of the MOPERM policy that specifically allows for coverage of Plaintiff's claims here. *Topps*, 272 S.W.3d at 415 ("The plaintiff shoulders the burden of proving the existence of an insurance policy, and that the terms of the policy cover the claims asserted by the plaintiff against the municipality."). Although Plaintiff generally asserts that the policy lists "Law Enforcement, General Liability and Personal Injury Liability" as part of the policy's coverage, Plaintiff provides no explanation why such a list extends MOPERM's coverage beyond what is indicated in Section One of the Memorandum of Coverage.

Because the Court finds that no exception to the City's sovereign immunity applies to this case, the Court grants Defendants' motion for summary judgment as to all Missouri state law claims against the City.

### ii. Claims against Cook and Degonia

Defendants hold that all of the claims made under Missouri state law against Cook and Degonia are barred by official immunity. The doctrine of official immunity "provides that public officers acting within the scope of their authority are not liable for injuries arising from their discretionary acts or omissions." *Jackson v. City of Wentzville*, 844 S.W.2d, 585, 586 (Mo. Ct. App. 1993) (quoting *State ex rel. Barthelette v. Sanders*, 756 S.W.2d 536, 537

(Mo. 1988)). A discretionary act "requires the exercise of reason in the adaptation of means to an end and discretion in determining how or whether an act should be done or course pursued." *Southers v. City of Farmington*, 263 S.W.3d 603, 610 (Mo. 2008).

Exceptions to official immunity include "acts performed in bad faith or with malice." *Conway v. St. Louis County*, 254 S.W.3d 159, 165 (Mo. Ct. App. 2008). "Bad faith or malice generally require actual intent to cause injury." *Id.* (quoting *Blue v. Harrah's N. Kan. City, LLC*, 170 S.W.3d 466, 579 (Mo. Ct. App. 2005)). There is no evidence in the record to indicate bad faith or malice on the part of Cook or Degonia, so the general rule applies.

Cook's decision to protect himself, which resulted in the fatal shooting of Morgan, was the product of his own judgment as a police officer. *See Green v. Denison*, 738 S.W.2d 861, 865 (Mo. 1987) (en banc) ("It is hard to imagine a setting more demanding of judgment than one in which line officers of the police department confront a person who has recently flourished a [weapon]."), *overruled on other grounds by Davis v. Lambert-St. Louis Int'l Airport*, 193 S.W.3d 760, 766 n.8 (Mo. 2006) (en banc). Suits such as Plaintiff's are exactly the type of actions that the doctrine of official immunity was established to protect against. *See Bachmann v. Welby*, 860 S.W.2d 31, 33 (Mo. Ct. App. 1993) ("Official immunity exists because 'fear of personal liability should not hang over public officials as they make judgments affecting the public safety and welfare.'").

The remaining question is whether Degonia, as Cook's supervisor, is liable for Cook's actions due to alleged inadequate training or supervision. As indicated previously, the Court presumes that Plaintiff's claims against Degonia are actually directed against the City. For

the reasons stated above, Plaintiff's claims against the City fail, and therefore Plaintiff's claims against Degonia likewise cannot stand.

Yet, even if Plaintiff were suing Degonia in his personal capacity, Degonia's decisions about Cook's training, the City's policies, and the enforcement of those policies qualify as the exercise of his official judgment. Plaintiff presents no argument to the contrary. Therefore, Degonia is entitled to official immunity.

For the foregoing reasons, the Court grants Defendants' motion for summary judgment as to all Missouri state law claims against Defendants Cook and Degonia.

### III. Conclusion

Accordingly, it is hereby ORDERED that Defendants' Motion for Complete Summary Judgment [Doc. # 41] is DENIED as to Plaintiff's Section 1983 claim against Cook, and GRANTED as to all other claims.

s/ Nanette K. Laughrey  
NANETTE K. LAUGHREY  
United States District Judge

Dated: August 3, 2011  
Jefferson City, Missouri